```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
```

Dwayne M. Valerio

    v.                                         Civil No. 15-cv-248-LM
                                                                           Opinion No. 2019 DNH 054

William Wrenn et al.[1]

## **O R D E R**

Before the court is the defendants' motion for summary judgment (doc. no. 63), as to the sole claim remaining in this case. Plaintiff Dwayne Valerio filed an objection (doc. no. 65) to the motion. Defendants filed a reply (doc. no. 67) to the objection, and Valerio filed a surreply (doc. no. 68).

## **Background**[2]

### I. Procedural History

The operative complaint in this matter is plaintiff's verified second amended complaint (doc. no. 57) ("SAC"), as construed by the court's November 29, 2017 Order (doc. no. 56) approving the magistrate judge's October 23, 2017 Report and Recommendation (doc. no. 53) ("October 2017 R&R"). The sole

---

[1]The defendants against whom this case is presently pending are New Hampshire State Prison Corrections Officers John Marescia and Bruce Sauerheber. All of the claims asserted against any other defendant have been dismissed, and all of the other defendants have been dropped as parties.

[2]The facts set forth in this section are undisputed unless otherwise noted.

claim pending in this case, as set forth in the October 17 R&R, is as follows:

> [Corrections Officers John Marescia and Bruce Sauerheber], on October 16, 2013, subjected Valerio to a visual body cavity strip search, in front of forty to fifty other inmates and a video camera that could be monitored remotely by prison officials, without a privacy screen, and in the absence of exigent circumstances, in violation of Valerio's First Amendment right to freely exercise his religion, as it violates Valerio's religious beliefs to be unclothed in the presence of other men.

October 2017 R&R, at 4.

## II. Facts Underlying Claim

On October 16, 2013, Valerio attended an event at the New Hampshire State Prison, where he is incarcerated, called the Tailgate Revival, which Valerio describes as a Christian religious event attended by forty to fifty prisoners and fifty community volunteers. See SAC, 4-5 ¶ 14 (Doc. No. 57). After the event, the community volunteers were escorted out of the gym, and the inmates remained in the gym with ten corrections officers ("COs"). See id. at 5 ¶ 16 (Doc. No. 57).

In the SAC, Valerio set forth the following sworn facts underlying his First Amendment claim, to which he swore in a declaration made pursuant to 28 U.S.C. § 1746:

> The COs . . . informed the inmates that they were stripping them out. The COs formed into three teams of three in which two performed a strip search each while one observed, which allowed for six inmates to be strip searched at the same time. These searches were conducted while the inmates being searched were

2

> in plain view of each other and all the other inmates
> awaiting to be stripped searched [sic]. The Plaintiff
> was called over by [CO Marescia] and ordered to strip.
> Plaintiff requested a private search due to his
> religious convictions, which was denied. The search
> was conducted out in the open without the use of
> privacy screens and [in] direct view and proximity of
> the remaining forty (40) to fifty (50) inmates waiting
> to be searched.

Id. at 5 ¶¶ 16-18 (Doc. No. 57). In the SAC, Valerio identified CO Sauerheber as the officer who observed Valerio's strip-search. See id. at 5 ¶ 19 (Doc. No. 57).

III. DOC Administrative Grievance Process

At the time the events underlying this case occurred, the DOC employed a procedure for handling inmate grievances "through which [inmates] seek formal review of an issue related to any aspect of their confinement if less formal procedures have not resolved the matter." DOC Policy and Procedure Directive ("PPD") 1.16(I) (eff. May 1, 2012) (Doc. No. 21-2, at 4). The DOC Manual for the Guidance of Inmates effective in October 2013 ("Inmate Manual") states that before utilizing that administrative grievance process, an inmate must "try to talk to a staff member" about his or her complaint. Inmate Manual (Doc. No. 21-1, at 8, 9). If an inmate does not receive a satisfactory response after making an informal oral request, he or she must then file an Inmate Request Slip ("IRS") to an appropriate prison official within thirty days of the date of the incident giving rise to the complaint. See PPD

3

1.16(IV)(A)(1) (Doc. No. 21-2, at 5); Inmate Manual (Doc. No. 21-1, at 8). The next step is a written grievance to the warden of the inmate's institution within thirty days of the date of the response the inmate received to his or her IRS. See PPD 1.16(IV)(B) (Doc. No. 21-2, at 6); Inmate Manual (Doc. No. 21-1, at 9). An inmate dissatisfied with the Warden's response may utilize the last step of the grievance procedure by sending a grievance to the DOC Commissioner within thirty days of the date of the Warden's response. See PPD 1.16(IV)(C) (Doc. No. 21-2 at 7); Inmate Manual (Doc. No. 21-1, at 9). The timeframes set forth in PPD 1.16 are mandatory, as is the use of appropriate forms at each stage of the grievance process. PPD 1.16(IV)(E)&(F) (Doc. No. 21-2, at 7, 8).

The NHSP advises incoming inmates of its administrative grievance procedure by "issu[ing] to all inmates upon their arrival at the NHSP a copy of the [Inmate Manual]." May 19, 2016 Decl. of Bonnie Johnson Theriault ("Theriault Decl.") ¶ 6 (Doc. No. 21-1, at 3). In addition to describing the grievance process, the Inmate Manual advises inmates where IRSs and grievance forms may be obtained, directs inmates to PPD 1.16., and states "The Complaint and Grievance process and its timeframe are mandatory and must be followed explicitly." Inmate Manual (Doc. No. 21-1, at 9). It is undisputed that Valerio, like other inmates, received a copy of the Inmate Manual upon his arrival at the NHSP.

4

IV. Valerio's Exhaustion Efforts

The parties agree that Valerio did not follow the exhaustion procedures set forth in PPD 1.16, in that he did not file an IRS, did not file a grievance to the Warden, and did not file a grievance to the Commissioner concerning his complaint that his First Amendment right to freely exercise his religion had been abridged by the post-Tailgate Revival strip search. Instead of following those procedures, Valerio complained about the October 2013 Tailgate Revival strip search using the process for Prison Rape Elimination Act ("PREA") administrative complaints, set forth in PPD 5.19, the DOC's policy concerning procedures for addressing "prison sexual assault, sexual victimization and staff sexual misconduct aimed at [DOC inmates]." To that end, on February 2 and 3, 2015, Valerio wrote two letters (doc. nos. 31-6, 31-7) to the New Hampshire Attorney General ("NH AG"), which he copied to the DOC Victim Services Office ("VSO"), and on March 26, 2015, he sent a letter (doc. no. 31-8) to the VSO. In each of those letters Valerio asserted that he had suffered "sexual victimization" during the October 2013 post-Tailgate Revival strip search because the defendants' conduct constituted "voyeurism," as defined in an attachment to the PPD 5.19. See PPD 5.19, Att. 5 (Doc. No. 31-4, at 15).

Defendants do not dispute that Valerio wrote three letters to the NH AG and the VSO in February and March 2015 alleging

5

that he had been subject to sexual victimization.  Further, it is undisputed that Valerio did not mention in any of the letters that the strip search violated the First Amendment, his right to exercise his religion, or otherwise violated his religious beliefs.

## **Discussion**

Defendants move for summary judgment arguing that Valero did not properly exhaust his available administrative remedies for his First Amendment religious freedom claim, as he did not utilize the grievance process outlined in PPD 1.16.

I.  Summary Judgment Standard

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016).  "An issue is 'genuine' if it can be resolved in favor of either party, and a fact is 'material' if it has the potential of affecting the outcome of the case."  Xiaoyan Tang, 821 F.3d at 215 (internal quotation marks and citations omitted).  To obtain summary judgment, "the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party."  Celotex Corp. v. Catrett, 477 U.S. 317, 332 (1986).  Once the moving party makes the

required showing, "'the burden shifts to the nonmoving party, who must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor.'" Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016) (citation omitted). "This demonstration must be accomplished by reference to materials of evidentiary quality," and that evidence must be "'significantly probative,'" and "more than 'merely colorable.'" Id. (citations omitted). The nonmoving party's failure to make the requisite showing "entitles the moving party to summary judgment." Id.

## II. PLRA Exhaustion Requirements

The exhaustion provision of the PLRA, 42 U.S.C. § 1997e(a), states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Requiring inmates to exhaust administrative remedies before bringing suit in federal court "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." Jones v. Bock, 549 U.S. 199, 204 (2007).

The Supreme Court has held "that the PLRA exhaustion requirement requires proper exhaustion." Woodford v. Ngo, 548

U.S. 81, 93 (2006). "[P]roper exhaustion" refers to "using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." Id. (citation omitted) (emphasis in original). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones, 549 U.S. at 218.

The PLRA also requires that "[a]ll 'available' remedies must . . . be exhausted." Porter v. Nussle, 534 U.S. 516, 524, (2002) (citation omitted). An inmate must exhaust all of the remedies available to him or her, whether those remedies are optional or mandatory under the prison's grievance process. See Johnson v. Thyng, 369 F. App'x 144, 148-49 (1st Cir. 2010) ("[t]he emerging case law rejects [plaintiff]'s theory that an optional level of administrative review need not be exhausted for purposes of PLRA" (citing cases)).

Claims for which administrative remedies have not been exhausted are subject to dismissal. Medina-Claudio v. Rodríguez-Mateo, 292 F.3d 31, 36 (1st Cir. 2002).

> The defendants bear the burden to show an administrative remedy was available and that [plaintiff] failed to exhaust it. If the defendants make this showing, the burden shifts to the prisoner to come forward with evidence showing there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him.

Fuqua v. Ryan, 890 F.3d 838, 844 (9th Cir. 2018) (internal quotation marks and citation omitted). "'Because failure to

8

exhaust is an affirmative defense that the defendants must plead and prove, the ultimate burden of proof remains with the defendants.'"  Id. (quoting Jones, 549 U.S. at 212).

III. Analysis

The questions before the court are whether the PPD 1.16 procedures were available to Valerio, and whether his letters complaining about the post-Tailgate Revival strip search constituted proper exhaustion of all of the administrative remedies available to Valerio, with regard to Valerio's First Amendment Free Exercise claim.  The court need not, and does not, consider whether the actions taken by Valerio were sufficient to exhaust a claim of sexual victimization under PREA, as no such claim is pending before the court.[3]

    A.    Alternative Means

Valerio asserts that because he satisfied the process outlined in PPD 5.19 for filing a complaint concerning sexual victimization, he exhausted the First Amendment claim as that claim arose out of the same event which gave rise to his alleged sexual victimization.  Notifying the defendants of a complaint by means other than the grievance process, however, does not

---

[3]Valerio raised such a claim in this matter, but the claim was dismissed as PREA does not provide for a private right of action.  See May 3, 2016 Order (Doc. No. 18) (approving Apr. 1, 2016 R&R (Doc. No. 15)).

9

satisfy the PLRA exhaustion requirement.  See Rachel v. Troutt, No. 18-6053, ___ F. App'x ___, 2019 WL 1077144, at *3, 2019 U.S. App. LEXIS 6825, at *6 (10th Cir. Mar. 7, 2019) (citation omitted); see also Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002) ("the doctrine of substantial compliance does not apply" in context of PLRA exhaustion).  Moreover, Valerio's letters about sexual victimization did not raise any issues about potential religious freedom claims.  Accordingly, the letters did not suffice to exhaust his First Amendment claim as a grievance must alert prison officials to the nature of the wrong or problem at issue to facilitate its resolution.  See Reyes v. Smith, 810 F.3d 654, 658-59 (9th Cir. 2016) (citing Jones, 549 U.S. at 219).

B. Ambiguity, Reasonable Notice, and Availability

Valerio, while not disputing he received an Inmate Manual prior to the October 2013 strip search, has argued in an earlier stage of this case that the Inmate Manual itself was unclear as to whether his complaints about the October 2013 strip search could be the type of complaints covered by the grievance process, as he did not know then what his rights were and thus could not conclude if his claims were covered by the grievance procedures.  See Obj. to Mot. to Dismiss (Doc. No. 31). Liberally construed, Valerio's objection to the instant motion

for summary judgment raises the same argument, which the court addresses on the merits for the first time here.

The undisputed facts in this case show that Valerio did not comply with any of the PPD requirements set forth in PPD 1.16, relating to inmate request slips, grievances, and the time limits for filing complaints. The mere existence of an administrative remedy process, however, does not indicate that the process was available to the inmate. In Ross v. Blake, 136 S. Ct. 1850, 1859 (2016), the Court noted three types of circumstances in which an administrative remedy, "although officially on the books," could be deemed unavailable, thus defeating a defense of a failure to exhaust under the PLRA. One of those categories identified by the Court is relevant to this court's consideration of plaintiff's argument here: specifically, when a grievance procedure exists, "but no ordinary prisoner can discern or navigate it."[4]  Id.

An inmate who is kept in the dark about grievance procedures may in some circumstances succeed in showing that the procedures are effectively unavailable. "Remedies that are not

---

[4]The three types identified by the Court in Ross are: (1) when the grievance procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it"; and (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross v. Blake, 136 S. Ct. 1850, 1859-60 (2016). There is no evidence to suggest that the first or third type of circumstance applies in his case.

reasonably communicated to inmates may be considered unavailable for exhaustion purposes." Small v. Camden Cty., 728 F.3d 265, 271 (3d Cir. 2013); Goebert v. Lee Cty., 510 F.3d 1312, 1323 (11th Cir. 2007) ("If we allowed jails and prisons to play hide-and-seek with administrative remedies, they could keep all remedies under wraps until after a lawsuit is filed and then uncover them and proclaim that the remedies were available all along."). Cf. Ramirez v. Young, 906 F.3d 530, 538 (7th Cir. 2018) ("[t]he PLRA does not excuse a failure to exhaust based on a prisoner's ignorance of administrative remedies, so long as the prison has taken reasonable steps to inform the inmates about the required procedures").

Pointing to the following language in the Inmate Manual -- "If at any time you feel you have a legitimate complaint . . ." -- Valerio has asserted that the Inmate Manual did not reasonably apprise him of the availability of the administrative remedies set forth in PPD 1.16 because the prison did not explain what would constitute a "legitimate complaint," appropriately raised through the grievance process.[5] See Obj. to Mot. to Dismiss (Doc. No. 31) (quoting Inmate Manual (Doc. No. 21-1, at 8). One problem with Valerio's argument about the lack

---

[5]Under the section heading, "Problem Solving Steps," the Inmate Manual states, in part, that "[i]f at any time you feel that you have a legitimate complaint because you have been wrongly treated or are not receiving fair responses from your unit staff members or other staff members, you have a right to file a complaint." Inmate Manual at 13 (Doc. No. 21-1, at 8).

of clarity in the phrase, "legitimate complaint," however, is that the term does not appear in isolation. The phrase is clarified by the words that follow it, specifically, an inmate might have a "legitimate complaint" because he suffered wrongful treatment or received an unfair response from prison staff members. See Inmate Manual at 13 (Doc. No. 21-1, at 8). In other words, "legitimate" complaints can arise from staff misconduct.

Further clarification comes from the remaining context. Under the heading of "Problem Solving Steps," the Inmate Manual summarizes the steps required by PPD 1.16 and refers inmates seeking "complete information" to review PPD 1.16, which the Inmate Manual states may be found in a DOC library. Doc. No. 21-1, at 8, 9. PPD 1.16, in turn, broadly states that it applies to all inmates "for issues that arose during their confinement," PPD 1.16(II), and that "the request slip, and grievance system provide methods for persons to complain about matters which seem to impinge on their rights or to redress wrongs," PPD 1.16(III)(D) (Doc. No. 21-2, at 4). That section notifies inmates that if an inmate request is found to contain false information, disciplinary sanctions may be imposed, see id. PPD 1.16(III)(D) (Doc. No. 21-2, at 5), which suggests that the qualifier, "legitimate," in the Inmate Manual, distinguishes between complaints based on facts and those based on falsehoods, and does not limit the type of issues covered by PPD 1.16.

13

In Ross v. Blakely, the Supreme Court clarified that courts must apply objective standards in considering whether a lack of clarity in the grievance procedures could be grounds for avoiding PLRA exhaustion. See id., 136 S. Ct. at 1859 ("when a remedy is . . . essentially 'unknowable'—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable," but "[w]hen an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." (citation omitted)).  When viewed in that light, Valerio's arguments about the lack of clarity are unavailing; evidence of ambiguity in a phrase in the Inmate Manual, taken out of context, and evidence of Valerio's uncertainty about the type of claims that could be grieved under PPD 1.16, taken together, do not come close to showing that the grievance procedures communicated to him by the Inmate Manual and PPD 1.16 were "essentially 'unknowable'" under Ross.

The undisputed facts demonstrate that the procedures outlined in PPD 1.16 were available to Valerio.  Valerio concedes that he did not use that process to exhaust his claims.  Accordingly, the defendants have shown they are entitled to summary judgment on their PLRA exhaustion defense.

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment (doc. no. 63) is GRANTED. The Clerk is directed to enter judgment and close this case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

March 25, 2019

cc: Dwayne M. Valerio, pro se
    Seth Michael Zoracki, Esq.